**SHARI RUSK**
Attorney at Law
P.O. Box 188945
Sacramento, CA 95818
Telephone: (916) 804-8656
Email: rusklaw@att.net

Attorney for Defendant
EDWARD CHARLES GASTON

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br>EDWARD CHARLES GASTON,<br>Defendant. | Case No. 2:17-CR-235 KJM<br><br>SENTENCING MEMORANDUM |

Mr. Edward Gaston, by and through undersigned counsel, respectfully submits the following memorandum to the Court for the proceeding scheduled to occur on August 15, 2022. The court has ordered a new PSR in the instant case which has yet to be produced. For reasons explained below Mr. Gaston respectfully requests a sentence of 64 months.  Sentencing Mr. Gaston to a sentence of 64 months would be sufficient but not greater than necessary to achieve the ends of justice and the goals of sentencing.

## I.     Introduction and Summary of Argument

Mr. Gaston's case has been extensively litigated and has a complicated procedural history. Several issues are relevant to the instant motion. Mr. Gaston has long maintained that he was subject to sentencing entrapment and should be granted a downward variance in his sentence. Mr. Gaston has also experienced several lengthy delays in his case – an initial and ongoing delay in receiving discovery, a delay caused by the government seeking reconsideration of the Court's recent order, and (most recently) a delay caused by the probation office's failure to follow the Court's order on the sentencing schedule. All of this has resulted in significant amounts of time in the Sacramento County Main Jail - both pre-trial and while Mr. Gaston awaits sentencing. These cumulative delays constitute an impingement of Mr. Gaston's due process rights which should be taken into account at sentencing. Finally, in accordance with this Court's order, Mr. Gaston's guidelines calculations must be determined after equalizing meth actual with meth mixture.

Mr. Gaston asks that this court sentence him based on an offense level of 26, minus three points for acceptance of responsibility, and criminal history category of VI. Mr. Gaston was convicted of distributing 222.2 grams of a mixture or substance containing methamphetamine, which results in a Base offense level of 26. After a three level reduction for acceptance, a level 23, criminal history category four puts him in the guidelines range of 84 - 105 months. Mr. Gaston respectfully asks the Court for a downward variance from these guidelines to 64 months.

## II.     Relevant Facts

Mr. Gaston would not have involved himself in a deal as large as the one for which he is accused without the involvement of and pressure from the CHS. The government alleges that the CHS began soliciting Mr. Gaston after Mr. Gaston left 2 oz. of methamphetamine in CHS's car on June 17, 2016. Mr. Gaston asked the CHS to hold onto it while Mr. Gaston was out of town. The

CHS was then instructed by their handlers to ask Mr. Gaston how much he wanted for the substance left in CHS's car. Mr. Gaston told the CHS they could sell it and make some money, as long as Mr. Gaston received $500 in return. Application for Authorization, Bates 0058. CHS met with Mr. Gaston the following day and gave Mr. Gaston $500 for the 2 oz methamphetamine. All evidence suggests that this is the only amount of methamphetamine Mr. Gaston was ever predisposed to or readily capable of selling.

On August 3, 2016, CHS1 contacted Mr. Gaston and requested a ½ pound of crystal methamphetamine. Application for Authorization, Bates 0073. Mr. Gaston had previously only been involved in sales far below this amount. Because Mr. Gaston lacked both the predisposition and the capacity to move amounts this size, Mr. Gaston scrambled to fulfill the agent's request. Mr. Gaston and CHS1 eventually agreed the cost would be $2200. Mr. Gaston emphasized that he would need a day's notice to get quantities of that size. Mr. Gaston stated this more than once, as he did not deal in larger quantities. DEA Report, Bates 1173. In fact, Mr. Gaston was having trouble securing the drugs CHS requested and agents reported he was "stalling," saying he needed more time to get the drugs. Application for Authorization, Bates 00073. At this time, CHS1 indicated they wanted to introduce a friend (CHS2) to Mr. Gaston and Mr. Gaston gave CHS1 his new phone number to give to CHS2. Mr. Gaston eventually told CHS2 that he had the ½ pound but CHS2 told Mr. Gaston that he was out of town and would be in contact in a few days. *Id.*

On August 11, 2016, CHS met with Mr. Gaston in a Home Depot parking lot to purchase 8 oz of methamphetamine. Prior to CHS's arrival, an adult female in a red Toyota Corolla met Mr. Gaston in the parking lot, removed a bag from the trunk of her vehicle and delivered it to Mr. Gaston. She remained in Mr. Gaston's vehicle while he joined CHS – with the bag – in CHS's vehicle. After a

few minutes in CHS's vehicle, Mr. Gaston got back in his Impala and left the area. FBI 302, Bates 0914-0915. This is the only transaction for which Mr. Gaston has been charged.

On September 1, 2016, CHS2 called Mr. Gaston again and told Mr. Gaston that CHS2 wanted four ounces of rock cocaine. Instead of conducting the sale, however, Mr. Gaston put CHS2 in touch with his previous source of supply, David Alhaqq. Mr. Alhaqq subsequently sold CHS2 4 oz of rock cocaine. Application for Authorization, Bates 0091. Soon thereafter, on September 1, 2016, Mr. Gaston had a phone conversation with a CHS in which Mr. Gaston "stated that he had pretty much stopped everything and had started going to church and going to college." DEA Report, Bates 1177. Nevertheless, heavy surveillance of Mr. Gaston– including a series of wiretaps- continued for several months after the incident for which he is charged (through at least April 13, 2017, Bates 1003-1041). Never again was Mr. Gaston observed or recorded selling any drugs. He was ultimately arrested on December 11, 2017 – 16 months exactly since the charged conduct took place.

## III. Arguments and Authorities

### a. Mr. Gaston Was Entrapped Into Procuring More Methamphetamine Than He Was Predisposed to Provide

Prior to the conduct for which he was charged in this case Mr. Gaston had only dealt in very small quantities - Mr.Gaston's uncharged conduct involved the sale of no more than 2 ounces of methamphetamine. If not for the government's involvement Mr. Gaston would have continued dealing in small quantities until he stopped dealing altogether.[1] The Ninth Circuit has consistently held that "Sentencing entrapment occurs when a defendant is predisposed to commit a lesser crime, but is entrapped by the government into committing a crime subject to more severe punishment."

[1] At the time of his arrest Mr. Gaston was no longer involved in dealing and was instead focused on his involvement in his church

*United States v. Mejia*, 559 F.3d 1113, 1118 (9th Cir. 2009); *see also United States v. Staufer,* 38 F.3d 1103, 1106 (9th Cir. 1994).

In *Staufer* the Court explained that sentencing entrapment is relevant to a defendant's culpability: "Furthermore, courts can ensure that the sentences imposed *reflect the defendants' degree of culpability* only if they are able to reduce the sentences of defendants who are not predisposed to engage in deals as large as those induced by the government." *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1994), emphasis added. Where a defendant has been subject to sentencing entrapment the Court may grant a downward departure or variance so that a sentence more properly reflects a defendant's culpability. *United States v. Boykin*, 785 F.3d 1352, 1360 (9th Cir. 2015), citing *United States v. Mejia*, 559 F.3d 1113, 1118 (9th Cir. 2009). This remedy can also be found in 18 U.S.C.S. app. § 2D1.1, n. 5, which reads, in relevant part,

> If, however, the defendant establishes that the defendant did not intend to provide or purchase, *or was not reasonably capable of providing or purchasing*, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that the defendant did not intend to provide or purchase or was not reasonably capable of providing or purchasing.

18 U.S.C.S. app. § 2D1.1, n. 5 (emphasis added)

The fact that Mr. Gaston was not predisposed to distribute this amount – and in fact had *not* distributed in this amount before – is evidenced by the description of the transaction in discovery. Agents described Mr. Gaston as "stalling" when the CHS asked for larger quantities. Mr. Gaston was not "stalling" – he was simply unable to get the amount of drugs requested by the CHS. Agent notes from that day indicate that Mr. Gaston's supplier would not even front him the drugs and came with him to the charged buy. Bates_0915.

Mr. Gaston was induced by the government to procure a larger quantity than he normally

would when the government made him "promises of a reward beyond that [citation omitted] inherent in the customary execution of the crime." *United States v. Mayfield*, 771 F.3d 417, 434-435 (7th Cir. 2014). The Ninth Circuit has said of inducement,

> [A]t bottom the government induces a crime when it creates a special incentive for the defendant to commit the crime. This incentive can consist of anything that materially alters the balance of risks and rewards bearing on defendant's decision whether to commit the offense, so as to increase the likelihood that he will engage in the particular criminal conduct.

*United States v. Poehlman*, 217 F.3d 692, 697-698 (9th Cir. 2000)

In Mr. Gaston's case, this special incentive was an extraordinarily inflated monetary reward for supplying an amount of drugs that Mr. Gaston was otherwise not predisposed to provide. The CHS in Mr. Gaston's case agreed to pay him $2200 for 8 ounces of methamphetamine. *See* Gaston_PM_1206, 8.2.16 recording CS1; *see also* Gaston_000073. This was well in excess of the customary price for 8 ounces of methamphetamine, a fact of which the government was well aware. This promise of a reward that was well beyond that "inherent in the customary execution of the crime" induced Mr. Gaston to commit a crime he was not previously predisposed to commit and which he did not have the personal wherewithal to commit. *See United States v. Poehlman*, 217 F.3d 692, 698 (9th Cir. 2000). ("Predisposition…[citation omitted] is the defendant's willingness to commit the offense *prior* to being contacted by government agents, coupled with the wherewithal to do so. [citation omitted].")

That Mr. Gaston was ultimately willing to get the drugs for the CHS does not change the calculus of sentencing entrapment. The question is not whether or not Mr. Gaston was willing but whether or not he would have been disposed to deal in such large quantities prior to the government's contact with him. *See United States v. Poehlman*, 217 F.3d 692, 703 (9th Cir. 2000). ("Despite Jacobson's willingness to commit the offense at the first opportunity … the government had failed to

show predisposition because it had failed to show that he would have been disposed … before the government started its correspondence with him.") It is clear from all of the evidence that Mr. Gaston was not predisposed to deal in quantities of this magnitude. All of his previous dealings with the CHS in this case were for amounts much smaller than the charged offense. Even after agreeing to the charged amount, Mr. Gaston had great difficulty obtaining it and was, in the end, unable to do so without the heavy involvement of his supplier.

Mr. Gaston's guilty plea in this case did not foreclose his sentencing entrapment arguments. As this Court is well aware, the Ninth Circuit has held that the type and quantity of a controlled substance a defendant is accused of trafficking is not an element of the offense. *See United States v. Jefferson*, 791 F.3d 1013, 1016 (9th Cir. 2015); *United States v. Thomas*, 355 F.3d 1191, 1195 (9th Cir. 2004). In previous filings on this issue the government has pointed to *United States v. Briggs* in support of its argument that Mr. Gaston's plea agreement prevented him from arguing sentencing entrapment at sentencing. But the Magistrate Judge has already addressed this issue in a written order on Mr. Gaston's discovery motions. The Defense will quote at length.

> Finally, the government contends that discovery is unavailable because a "sentencing entrapment" theory is precluded by defendant's plea, citing *United States v. Briggs*, 623 F.3d 724 (9th Cir. 2010). ECF No. 103 at 1. No argument is provided in support of this conclusory assertion. In Briggs, there had been a plea agreement that specified the quantities on which the sentence was based, and as to which the defendant argued entrapment at sentencing. Accordingly, the guilty plea was flatly inconsistent with the sentencing theory, which the Court of Appeals rejected as "foreclosed." Here, there was no plea agreement and no stipulation as to sentencing-related facts beyond the factual basis for the plea itself. To the contrary, the defendant reserved certain issues for litigation at sentencing. See Carucci, supra, 183 F.R.D. at 614 (noting that plea agreement reserved issue as to which sentencing discovery was sought). Accordingly, Briggs does not apply.

*United States v. Gaston*, No. 2:17-CR-00235 KJM, 2021 U.S. Dist. LEXIS 173657, at *5 (E.D. Cal. Sep. 10, 2021)

The government has previously claimed that Mr. Gaston is a "seasoned drug dealer" who "coached" the CHS on prices they could get for larger quantities of methamphetamine. But talking about larger quantities is not the same as actually dealing in larger quantities and the defendant's unseemly words do not amount to evidence of the truth of those words. The fact is, Mr. Gaston was never capable of dealing in such large quantities and when the CHS asked him to do so he scrambled to gather the drugs, lured by the much inflated price the CHS said they would be willing to pay. Mr. Gaston was subject to sentencing entrapment and his sentence should be adjusted accordingly.

**b. Delays Were Not Arbitrary and Should Be Considered in Sentencing Mr. Gaston**

Mr. Gaston has experienced numerous delays during the pre-trial and pre-sentencing phase of his case. This has caused intense emotional distress and anxiety for Mr. Gaston in a variety of ways (explained in more detail below). Significantly, the discovery related delays in Mr. Gaston's case were not incidental or accidental and were instead caused by the government's refusal to provide Mr. Gaston with discovery to which he was entitled.

Mr. Gaston began requesting discovery – specifically, audio/video recordings of conversations between Mr. Gaston and CHS in this case – soon after his arrest in 2017. These recordings were referenced throughout Mr. Gaston's discovery and their existence was no secret. Despite the government's own discovery acknowledging the existence of the recordings, the government continued to deny their existence and Mr. Gaston was not granted access. On June 25, 2018, the government told the Court that all discovery had been provided, despite contrary information from the Defense. *See* Minutes for Status Conference, Dkt. 21. Having been held for a year and a half with the government still denying that the tapes existed, Mr. Gaston ultimately

entered into his plea deal in April 2019. Soon thereafter the government admitted the existence of the recordings but still refused to supply them. The government's refusal to turn over the tapes lasted for a total of 18 months until October 26, 2020, when they released a single 50-minute recording between the defendant and CHS1. On January 22, 2021, several more recordings were released to Defendant's attorney but not to the defendant (as stipulated in the protective order). The government continued to deny Mr. Gaston and his defense team access to several recordings at this point. These denials were based in large part on the government's misguided belief that producing the recordings would unnecessarily expose the identity of their CHS. *See, for example,* Opposition to Defendant's Motion for Discovery, Dkt. 103. On September 10, 2021, the court issued an unequivocal order instructing the government to turn over the remaining tapes to Mr. Gaston's defense team. The court held that "[D]isclosure is required if the recorded statements are 'relevant.' Rule 16(a)(1)(B). This is not an onerous burden… [D]efendant must have access to his own recorded statements for purposes of preparing his sentencing case." Order, Dkt. 106.

The government's unwillingness to turn over these tapes which were of obvious relevance to and necessary for the preparation of Mr. Gaston's case for almost *three years* resulted in extensive and entirely unnecessary delays in bringing Mr. Gaston's case to both a plea deal and then sentencing. Mr. Gaston has been held at Sacramento County Main Jail for the entirety of this time and has suffered significant emotional and mental distress because of his conditions there.

Rule 32 of the Federal Rules of Criminal Procedure dictate that "The court must impose sentence without unnecessary delay." USCS Fed Rules Crim Proc R 32(b)(1). As the Second Circuit has explained, "The directive set forth in Rule 32, taken together with the general prohibition of 'oppressive delay' established by the Due Process Clause [citation omitted] protects criminal defendants from unreasonable delays between conviction and sentencing." *United States v. Ray*, 578

F.3d 184, 199 (2d Cir. 2009). *See also Betterman v. Montana*, 578 U.S. 437, 439, 136 S. Ct. 1609, 1612 (2016) ("For inordinate delay in sentencing…a defendant may have other recourse, including, in appropriate circumstances, tailored relief under the Due Process Clauses of the Fifth and Fourteenth Amendments.").

The Court in Ray went on to explain the two factors relevant to a finding of a Due Process Violation: [1] the reasons for the delay and [2] the prejudice to the accused. Not only must both factors be present for a Due Process Violation to have occurred but also "[T]hey are related factors to be weighed in light of each other and the surrounding circumstances." *United States v. Ray*, 578 F.3d 184, 199-200 (2d Cir. 2009). These considerations have also been noted by the Supreme Court in *Betterman,* "Relevant considerations may include the length of and reasons for delay, the defendant's diligence in requesting expeditious sentencing, and prejudice." *Betterman v. Montana*, 578 U.S. 437, 448 n.12, 136 S. Ct. 1609, 1618 (2016).

In evaluating the reasons for the delay, the court in *Ray* considered whether or not the delays were deliberate on the part of the prosecution (which would weigh heavily against them) or if there were more neutral reasons – such as negligence or overcrowded courts (which would weigh less heavily but still be considered). *United States v. Ray*, 578 F.3d 184, 200 (2d Cir. 2009). The court also considered whether or not the defendant was responsible in some way for the delay. *Id.* Prejudice must be "substantial and demonstrable." *Id.*

Evaluating Mr. Gaston's claim based on the above factors results in a favorable analysis for Mr. Gaston. The length of the delay has been substantial (and is, in fact, potentially ongoing). The main source of the delay has been the government's withholding of evidence. Mr. Gaston has been requesting this evidence since his arrest in December 2017. His sentencing has been pushed back multiple times since his plea agreement was signed in April 2019 because of the government's refusal

to turn over evidence which the court has found on more than one occasion that the government has a duty to turn over. Not counting any pre-plea agreement delays (which the defense certainly is entitled to count, since many of these delays were caused by the government's refusal to turn over the same evidence), it has been three and a half years since Mr. Gaston signed his plea deal. The majority of this time has been spent litigating the discovery issues in his case. If the government had followed through on its discovery obligations from the beginning there would not have been any delay in Mr. Gaston's sentencing. Although there is now a sentencing date set for Mr. Gaston, it is quite possible that this date will get pushed back yet again, through no fault of Mr. Gaston's, because the government asked this Court to reconsider its carefully weighed order and the probation office has not met the current sentencing schedule deadlines. Probation has requested more time to prepare a new PSR based on the Court's order regarding the application of a mandatory minimum in this case. This delay was exacerbated by the government's filing of the Motion to Reconsider the Court's order – an order that was both thoughtful and well-grounded in case law.

While the government has caused continual delays with its refusal to hand over evidence it is obligated to share with the defense, Mr. Gaston has taken steps to speed the process along whenever he has been able. The timing of his plea agreement was an attempt at this, however misguided. And he has attempted more than once to assert his Speedy Trial rights. Mr. Gaston has refused the government's request to push back sentencing, despite the lack of a new PSR, because he feels he is unable to continue any term of confinement in the Sacramento County Main Jail.

The amount of prejudice Mr. Gaston has suffered during his time at the Sacramento County Main Jail has been significant. While the Supreme Court has held that Speedy Trial rights are not equivalent to post-conviction rights, some comparison here is instructive. In *Barker* the Court identified three interests relevant to a finding of prejudice in Speedy Trial violations: "(i) to prevent

oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker v. Wingo*, 407 U.S. 514, 532, 92 S. Ct. 2182, 2193 (1972). Much of Mr. Gaston's time in Sacramento County Main Jail could not be considered "pre-trial" as he was awaiting sentencing. However, these interests still attach, albeit in a slightly altered fashion.

Mr. Gaston has been in jail during what has been arguably the worst time to be in jail in our lifetimes. With the arrival of COVID-19, every day spent in Sacramento County has been a day that Mr. Gaston has had to fear for his health and his life. This has contributed to skyrocketing levels of anxiety and what could only be described as "oppressive" incarceration. Not only has Mr. Gaston had to live in fear for his own health and safety, but he has also had to endure lockdowns, limited access to outside time, limited access to visits, and a variety of other restrictions that are beyond the norm for life in Sac County Jail. Had he been in a BOP facility his incarceration would have been much less impactful and oppressive. Overcrowding in county jails has exacerbated the risk for COVID transmission. In a bizarre twist, Sacramento County has not denied overcrowding but instead blames COVID for its inability to keep prisoners safe.[2] Mr. Gaston has also been the target of harassment and verbal abuse by guards at the jail.

The amount of First Step Act credits and good time that Mr. Gaston could have earned serving the last three and a half years in a federal facility instead of the Sacramento County Main Jail is not insignificant. The end result of Mr. Gaston spending this time in Sac County instead of a federal facility is more time spent in custody.

## IV. A Sentence of 64 Months is Sufficient But Not Greater Than Necessary

### a. History and Characteristics of the Defendant

[2] https://www.kcra.com/article/inmate-conditions-sacramento-county-jails-blame-covid-19-overcrowding/39039728

Mr. Gaston is a 38 year old man from Stockton, California. He has four children (including a non-biological child – who is special needs) - and is active and involved in their lives. Prior to his arrest he had become a minister and served at the Pentecost Church in Stockton. This is the life Mr. Gaston was leading at the time of his arrest. The charges against him were for conduct that occurred in August 2016 but Mr. Gaston was not arrested until December 8, 2017. During this lengthy interval Mr. Gaston had worked hard to better himself and change the path his life had been on. He quit drinking and using drugs and began attending church and bible studies. His arrest and subsequent time in jail have caused a break in all of the work he had been putting into making these positive changes in his life.

Mr. Gaston's life has not been an easy one. His mother and father never married and he lived primarily with his mother when he was a child. His mother did her best to support him and his seven siblings but turned to prostitution to make ends meet. She also struggled with drug addiction – an addiction which would tragically lead to her death in 2017 (the same year of the offense for which Mr. Gaston has plead guilty). Mr. Gaston began dabbling in drugs and alcohol at an early age due to his unstable family life – his mother and aunts began giving him alcohol (wine coolers) when he was only 4 or 5 years old. Not having anywhere else to go, Mr. Gaston's family often lived with his mother's boyfriends who were physically abusive to him. Lacking the care and love he needed at home, Mr. Gaston turned toward a life on the streets at the very early age of 10 – long before he had any real knowledge or understanding of what such a life might mean. By the age of 12 he was placed in juvenile detention and thereafter was completely on his own, with no support from his family.

Mr. Gaston has expressed interest in continuing his education in both business management and his religious studies. He has maintained steady employment since at least 2015 and is looking forward to the opportunity to reenter society and make positive changes in both his community and

his family. His family has struggled financially since his arrest as she tries to support herself and their four children.

**b. Nature and Circumstances of the Offense**

Mr. Gaston has been charged with and plead guilty to a single count of Distribution of 50 grams or more of Methamphetamine (actual) in violation of 21 U.S.C. § 841(a)(1). The charge stems from the sale of 222.2 grams of methamphetamine to a CHS on August 11, 2016. The sale occurred after what agents described as "stalling" from Mr. Gaston. The "stalling" was in fact a result of Mr. Gaston's having to scramble to procure the requested amount of drugs. It was not an amount Mr. Gaston was used to dealing in and he was almost completely unable to follow through with the deal. In the end, Mr. Gaston's supplier met him at the parking lot where the transaction was to occur and handed off the drugs to him moments before the deal happened. This individual remained in Mr. Gaston's vehicle during the transactions.

Although agents continued to surveil Mr. Gaston for over a year until his arrest in December 2017, no other charges were filed against him. Mr. Gaston has been charged with a single, non-violent offense and had dramatically turned his life around by the time he was arrested.

**c. Need for Sentence Imposed to Reflect Seriousness of Offense, to Adequately Deter and to Protect the Public**

Mr. Gaston has asked that the court calculate his guidelines with a base offense level of 26, minus three points for acceptance of responsibility. This would put him at an offense level of 23 with Criminal History Category VI, resulting in a guidelines range of 84 - 105 months. Mr. Gaston asks the Court to vary less than 2 years from the bottom of the guidelines taking into account the numerous delays and the fact that he would have received significantly more sentence credit if he was in a BOP facility.

Mr. Gaston has already been in custody for almost 5 years. During that five years COVID-19 has ravaged its way across the world and through the jail and prison system. This alone has been a significant and unthinkable punishment for Mr. Gaston. He has spent years worrying about not only his own health, but also the health of his family while being locked away from them. He has been denied the opportunity to continue making all of the positive changes in his life that he was so earnestly pursuing at the time of his arrest. He has endured targeted harassment from the guards at the jail and has suffered from anxiety related conditions. Despite all of this, Mr. Gaston has maintained a clean record during his time at the jail and continues to attend his bible studies twice a week from within Sac County. He remains committed to becoming a better person despite facing much adversity.

Mr. Gaston has requested a sentence of 64 months because such a sentence would achieve the goals of sentencing but would not be greater than necessary. Mr. Gaston understands the seriousness of the charges he has plead guilty to. Indeed, he was already making great strides in addressing the failures of his life and his bad choices prior to his arrest in 2017. But his charges are non-violent in nature and he has already served a significant amount of time in prison under the most stressful and dire of circumstances. This is more than enough of a deterrent for Mr. Gaston. He had already given up on this lifestyle at the time of his arrest and remains committed to moving towards a more positive future for himself and his family. He poses no danger to the public and only looks forward to the day when he will be able to reenter society and help his community during this time of such great need.

Ordinarily, a new PSR would have been prepared for the Court to consider, pursuant to the Court order and sentencing schedule. This did not occur, despite Mr. Gaston's best efforts. The previously prepared pre-sentence report contains the incorrect guideline calculations, but based on this Courts order, there can be no dispute that 222.2 grams of methamphetamine results in an offense

level 26.  With a three level reduction for acceptance, his offense level is a 23. His criminal history category was correctly calculated in the initial PSR. At this point, the government is advocating sentencing on August 15, 2022 and is apparently willing to waive a corrected PSR. The government indicates it would seek the same sentence, regardless of the corrected guideline calculations.  Mr. Gaston sought a corrected PSR in his February 10, 2022 motion to withdraw his plea or in the alternative decline to impose a mandatory minimum sentence. This Court made its ruling on April 25, 2022 and followed with a written order on April 27, 2022.  A draft PSR was due to Mr. Gaston on July 5, 2022. If Mr. Gaston were to await a pre-sentence report at this point, he would likely be held at the Sacramento County Jail for at least three additional months. Given his emotional state and stress level, the more just option would be for the Court use the meth mixture guideline for 222.2 grams, resulting in an offense level 23, criminal history category VI and the range of 84 – 105 months.

## V.      Conclusion

Mr. Gaston has been in custody since December 2017. Throughout this time he has maintained his commitment to changing his life for the better – a commitment that began well before his arrest. He has done this despite numerous delays, a pandemic, and crippling anxiety. Mr. Gaston is ready to face the consequences for his actions and respectfully asks the Court to consider the various issues relevant to his sentencing described above. Sentencing Mr. Gaston to more than 64 months will do nothing to further the ends of justice. He should be returned to his family so that he can help his family, be a part of raising his children and continue his work as a minister in his community.

Respectfully Submitted,      /s Shari Rusk
                             Attorney for Defendant
                             **Charles Edward Gaston**

Dated: August 7, 2022